**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **CRIMINAL NO. 10-141** |
| | : | |
| **MITCHELL RUBIN** | : | |

**GOVERNMENT'S GUILTY PLEA MEMORANDUM**

**I.      INTRODUCTION**

The government has filed an information charging defendant Mitchell Rubin with one count of obstruction of justice, in violation of 18 U.S.C. § 1503.  The charges arise from defendant Rubin's intentional efforts to withhold material information requested by the grand jury, and failure to fully and honestly respond to questions presented during questioning by federal investigators regarding the reason for the Senate Democratic Appropriations Committee contract with B&R Professional Services, Inc. and the nature of Rubin's relationship with and work for Senator Vincent J. Fumo under the contract.

**II.      PLEA AGREEMENT**

The defendant has agreed to plead guilty to the charge in a written plea agreement, a copy of which is attached to this memorandum.

The parties agree that this plea agreement is made pursuant to Federal Rule of Criminal Procedure 11(c)(1)(A), and that the government will not bring any additional

charges against the defendant arising from Grand Jury Matter No. 03-123.  The

government, the defendant, and his counsel further agree that this plea agreement is made

pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), and have agreed upon the

following specific sentence as the appropriate disposition of this case:

> a.      Five years' probation, with the first six months to be served in home confinement with electronic monitoring (costs to be paid by the defendant).  During the six-month period of home confinement, the defendant shall be permitted to leave his home to go to work from 7 a.m. until 7 p.m. Monday through Friday, and for such additional time requested for work-related activities as the Probation Office deems appropriate; to complete his community service obligation (see subparagraph (b) below); to attend religious services; to receive medical treatment; and to meet with his counsel.  In addition, the defendant shall be permitted to leave his home for a total of four hours each week (including weekends) in order to attend to personal chores and to visit family members.

> b.      150 hours' community service.

> c.      A payment of $150,000 to the Senate of Pennsylvania.  This payment will satisfy all restitution, fines, and penalties in this matter (exclusive of the special assessment under subparagraph (d)).  The defendant makes this payment without admission of any liability to the Senate of Pennsylvania, but makes this payment to settle and compromise any claim which may be asserted against him by any claimant for such restitution.  The defendant agrees that this payment shall be made prior to the date of sentencing.

> d.      A special assessment of $100.  The defendant agrees to pay the special assessment before the time of sentencing and shall provide a receipt from the Clerk to the government before sentencing as proof of this payment.

> e.      No period of supervised release shall be imposed.

If the Court rejects this plea agreement, it is agreed that the defendant shall be advised of

the court's rejection of the plea agreement and that the defendant shall have the opportunity

to withdraw his plea pursuant to Federal Rule of Criminal Procedure 11(c)(5).  If the

defendant elects not to withdraw his plea, then the plea agreement shall automatically

convert to an agreement pursuant to Rule 11(c)(1)(B), and this specific sentence shall be

the joint recommendation of the parties, although not binding on the Court.

The government's reasoning in advocating this sentence is set forth later in

this memorandum.

III.   **ESSENTIAL ELEMENTS OF THE OFFENSE**

To establish obstruction of justice, in violation of 18 U.S.C. § 1503, the

government must prove the following essential elements beyond a reasonable doubt:

1.   The defendant corruptly;

2.   Influenced, obstructed, or impeded, or endeavored to influence, obstruct, or impede;

3.   The due administration of justice; and

4.   The defendant knew there was a pending judicial proceeding.

IV.   **MAXIMUM PENALTIES**

The Court may impose the following statutory maximum sentence:  a term of

imprisonment of 10 years, a 3-year period of supervised release, a $250,000 fine, and a

$100 special assessment.

The defendant further understands that supervised release may be revoked if

its terms and conditions are violated.  When supervised release is revoked, the original

term of imprisonment may be increased by up to 2 years per count of conviction in the case

of Class C felonies.  Thus, a violation of supervised release increases the possible period

of incarceration and makes it possible that the defendant will have to serve the original

sentence, plus a substantial additional period, without credit for time already spent on

supervised release.

## V.       FACTUAL BASIS OF GUILTY PLEA

In this case, defendant Mitchell Rubin has agreed to plead guilty to one count

of obstruction of justice, in violation of 18 U.S.C. § 1503, and the parties have agreed,

pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), to a specific sentence as the

proposed resolution.  This agreement is a negotiated compromise in a matter in which the

parties disagree regarding substantial facts.  Each party believes that the resolution serves

its interest in avoiding the uncertainty of a trial, and obtaining an appropriate result for

criminal conduct.

This statement first sets forth the government's position regarding facts it

believes it could prove at trial related to Rubin's conduct.  It then articulates Rubin's

position, and explains the parties' agreement.

### A.       Facts the Government is Prepared to Prove at Trial.

In the government's view, Rubin received a no-work contract from

Pennsylvania State Senator Vincent J. Fumo, and, when questioned about it by the FBI and

then subsequently before the grand jury, presented false information.  (As will be explained

later, Rubin agrees that he endeavored to mislead the grand jury and withheld material facts

4

during his FBI interview prior to his testimony, but he denies fraudulent conduct and he denies making specific false statements to the grand jury itself.)

### 1.  The Senate contracts.

Former Senator Fumo was convicted in a jury trial of numerous counts of fraud, tax offenses, and obstruction of justice.  Among many offenses, he was convicted of perpetrating a fraud on the Senate by using its resources and personnel for his personal and political benefit.  Part of that conduct involved his award of contracts to friends and others who carried out personal and political tasks on his behalf.

From 1985 through 2007, Fumo was the chairman of the Senate Democratic Appropriations Committee ("SDAC").  In this capacity, he controlled a large budget, which was approximately $5 million annually during the relevant time period, part of which he used to pay contractors for purported service to the Committee.  As the jury found, Fumo abused this power by using SDAC funds to pay contractors who served no legislative purpose.

One of those contractors, the government would establish, was Mitchell Rubin.  Since the mid-1990s, Rubin was one of Fumo's closest friends.  Along with his wife, Ruth Arnao, a longtime Fumo aide who ultimately became his deputy chief of staff and the executive director of Fumo's nonprofit charity, Citizens Alliance for Better Neighborhoods, Rubin socialized constantly with Fumo.[1]  Fumo owned condominiums in

---

[1]  Arnao was convicted in the Fumo trial of fraud, tax, and obstruction charges, and sentenced to a year and a day in prison, a sentence which the government has appealed.  She

Ventnor, New Jersey, and Rubin and Arnao bought one of the units, and spent summer weekends with Fumo.  Fumo bought a house in Florida, and Rubin and Arnao bought a condominium nearby.  Fumo went for two weeks each year to Martha's Vineyard, in part to take yacht trips he illicitly obtained from the Independence Seaport Museum, and Rubin and Arnao went on every such trip from 1999 through 2004.  Likewise, they dined with Fumo regularly in Philadelphia (with the Senate, or Fumo's bank, or his political campaign committee picking up the tab).

Besides being attached to Fumo socially, Rubin became an important political fundraiser for Fumo.  Rubin was co-owner of a business, B&R Professional Services, Inc., which provided court reporting, process serving, and document retrieval services to attorneys.  In that capacity, he was well-connected to obtain political contributions, and became particularly involved in judicial races.

Fumo arranged for Rubin to be appointed to the Pennsylvania Turnpike Commission (PTC), a part-time position.  Gov. Ridge appointed Rubin in 1998, and Rubin was then reappointed in 2002.  In 2003, after Gov. Rendell took office, Rubin was selected as chairman of the PTC, at Fumo's urging.[2]

---

is currently serving her sentence.

[2]    In March 2009, after Fumo was convicted and Rubin was served with a target letter in this matter, Gov. Rendell fired Rubin from the PTC.

Fumo also arranged for payment of public money to Rubin's business.  On

October 1, 1999, the Senate Democratic Appropriations Committee entered a contract with

B&R Professional Services, Inc.  It provided:

> To purchase professional services to the Democratic Appropriations Committee to include, but not limited to research, analysis and make recommendations on legislative matters, assist on constituent services.
>
> Payment to be billed by invoice for these services performed.
>
> Consultant is to be reimbursed for expenses incurred to these services.

The annual amount paid was $30,000 per year, beginning on October 1, 1999,

and concluding on September 30, 2004.  Every month, B&R simply sent an invoice for

"services rendered," with the amount due that month.  The annual contract was renewed four

times.  B&R thus collected $150,000 in Senate money, without ever specifying any work it

did.  Only one time in five years did B&R charge for an expense -- a $60 charge for filing,

on behalf of SDAC counsel Christopher Craig, a motion for sanctions and motion to quash

subpoena in litigation related to Lincoln University, on June 14, 2001.

In the Fumo indictment and at trial, the government alleged that neither Rubin

nor B&R did anything in return for the contract.  The jury agreed, finding Fumo guilty of

two counts related to payments to B&R.

In proving the allegation, the government reported that a subpoena to the

Senate for all work product involving Rubin produced nothing.  Similarly, Rubin's company,

B&R, stated that it has no documentary evidence of any work performed pursuant to this

contract.  Kathleen Finley, the manager of the B&R office, testified that she searched for

records regarding the Senate contract, and found none.  She said that she asked Rubin if he had any, and he said, "no;" she also asked the co-owner of the company, Frederick Blum, and the heads of the company's departments, and all knew nothing about the contract.  She said that during the contract period, Rubin would call her every month and instruct her regarding what amount to bill the Senate.  She sent bills by mail and received payments by mail.  No time records were kept, and Rubin never told her what he was doing under the contract.  According to Finley, this contract was unique in B&R's business.  Rubin did call in sometimes and say he was at the Senator's office, but she stated she did not know why he was there.

During the trial, the government asked numerous witnesses who were in a position to observe any work that Rubin did whether they were aware of any, and all replied in the negative.  For example, Fumo's then-girlfriend, Dorothy Egrie, who spent a great deal of time with Rubin, as part of Fumo's core group of friends, at the New Jersey shore and on vacation, said that she was unaware that Rubin had a contract with the Senate Democratic Appropriations Committee, while at the same time she was very familiar with all of Rubin's other affairs.  She knew, for example, that he was a Pennsylvania Turnpike Commissioner.  She also recalled specific discussions between Rubin and Fumo regarding various money-making ideas, including:  1) plans to get a contract with the City of Philadelphia to supply ankle bracelets to parolees, 2) a deal Rubin was trying to put together with a wealthy Fumo friend, Steve Marcus, to put ATM machines in the Turnpike travel plazas, and 3) discussions with an owner of fast food restaurants to put his eateries in Turnpike travel plazas.

8

Likewise, during the government's case-in-chief, the prosecution asked the witnesses listed below whether they were aware of any work performed on behalf of the Senate by either Rubin or B&R.  Each stated that he or she was not.  The witnesses were:

-- Lillian Cozzo, Fumo's district office executive secretary, who coordinated Fumo's affairs in Philadelphia.

-- Jamie Spagna, an aide in the district office who worked directly for Ruth Arnao.

-- Maryann Quartullo, an aide in the district office.

-- Don Wilson, a computer technician in the district office.

-- Howard Cain, Fumo's political consultant (who was also the beneficiary of a fraudulent Senate contract).

-- Frank Wallace, a private investigator employed by Fumo (also through a fraudulent Senate contract).

-- Patricia Kirby, who maintained a database at the district office regarding political contributions.

-- Gerald Sabol, a budget analyst in Fumo's Harrisburg office.

-- Christian Soura, a budget analyst in Fumo's Harrisburg office.

-- Christian Marrone, a legislative assistant in Fumo's district office.

-- Charles Sholders, a clerk in Fumo's Harrisburg office who processed Rubin's and other contractors' invoices.

2.      **The defense case at trial.**

The defense position at Fumo's trial was that Rubin earned the payments not through any services provided by B&R, but by acting as an adviser to and representative of Fumo with regard to numerous legislative issues.

The principal witness advancing this story was Fumo himself.  He testified that Rubin interacted on Fumo's behalf with many institutional constituents, naming the Philadelphia Chamber of Commerce, Children's Hospital, Drexel University, St. Agnes Hospital, and others, saying Rubin was his conduit to "upper institutions of higher education, hospitals, and things like that."  He said that Rubin also interacted with other elected officials on his behalf, naming Congressman Robert Brady, whom Fumo said Rubin met with in Washington on his behalf, and members of the Street Administration.  Fumo said that there was no doubt in his mind that Rubin earned $30,000 per year; Fumo said this probably just covered Rubin's expenses for breakfasts and lunches, which Rubin never submitted.

The defense called three other witnesses to bolster this account.  First, David Urban, a former chief of staff for Senator Specter, recalled a single one-hour meeting, in approximately 2000, during which Rubin accompanied others who were seeking financing for the Jefferson Square low-income housing development.  Second, James White, a Harrisburg lawyer, testified that he called Rubin once to gain intelligence regarding the Philadelphia sheriff's office and its stand on foreclosures.  On cross-examination, White stated that he believed this phone call took place after the period of Rubin's Senate

10

contract, and that White was not aware of any contract when he initiated the call.  Third, Jeffrey Suzenski, a part-time lobbyist at the Stevens & Lee firm in Harrisburg, stated that he occasionally saw Rubin in the Capitol, ordinarily in spontaneous encounters, and when he did, discussed with Rubin issues which Rubin said were also of interest to Senator Fumo, such as health care.

During the trial, outside the presence of the jury, the defense identified five other witnesses it planned to call on this subject.  However, the prosecution team then contacted all of them, who stated either that they would refuse to testify, or that they had little information to provide.  When asked for specifics, these other individuals reported similar scant contact with Rubin during the years in question.[3]

In closing argument, the government belittled the defense testimony. Broadly, we asserted that Fumo's account regarding Rubin's supposed consulting was just one of dozens of instances in which Fumo presented inventive and false testimony about every relevant subject in the indictment.  The jury rejected all of Fumo's testimony in convicting him of all counts.

The government also highlighted the fact that Rubin never took the stand to tell this story himself, even though he sat in the courtroom, right behind the defense table,

_____

[3] The only exception was another former government aide, who said that he did have contacts with Rubin in which Rubin was representing Fumo's interests.  However, the government was prepared to cross-examine that witness with e-mails he exchanged with Fumo in which the witness referred to the federal investigators in obscene terms, suggesting significant bias.  The Fumo defense did not call this former aide as a witness.

during virtually the entire five-month trial.  Further, we observed, if Rubin had in fact met with Congressmen, executives, and others on Fumo's behalf, the jury undoubtedly would have heard those witnesses as well.  Instead, the presentation they heard was minuscule -- a Senate aide who had a single meeting in 2000, which Rubin attended for unknown reasons; a lawyer who had one phone conversation with Rubin, probably after Rubin's contract ended; and a part-time lobbyist who chatted with Rubin when he saw him in Capitol hallways.

What happened, the government suggested to the jury, was that Fumo and his aides searched their collective memories for any conversation Rubin ever had that related to a subject in which the Senate may have an interest.  We added that, given the fact that Rubin was a very busy individual, heavily involved in public affairs, political activities, and business ventures, while Fumo's responsibilities as a legislator extended to virtually any subject of public consequence, the defense could identify a few conversations Rubin had in his ordinary affairs and then suggest they somehow related to Fumo.  And even then, the defense only accounted for a few hours of Rubin's time.

We also pointed out that the Senate contracts were with B&R, which would be anomalous if their purpose was to secure Rubin's personal services for legislative consulting.  B&R was an attorney service firm that served subpoenas, obtained copies of public records, and filed pleadings with the courts.  It was co-owned by Rubin with another person.  What really happened, the government argued, was that Fumo and Rubin intentionally entered the contract in B&R's name as a cover for the illicit transfer of funds from the Senate to Rubin.

The government also noted that Rubin's contract abruptly ended in June 2004, shortly after the federal investigation came to light.  In contrast, Fumo acted to maintain other illicit contracts he had entered, with Howard Cain for political consulting, and with Frank Wallace for personal investigation services, by changing the contract wording and billing practices to make those contracts appear more legitimate.  The reason, we suggested, was that Cain and Wallace provided actual personal and political assistance which Fumo needed and wanted to continue, while the contract with Rubin (and another contract with another friend, S. Michael Palermo, which ended the same year) was just a giveaway of money to a friend and could not conceivably be justified.[4]

The jury rejected Fumo's defense and convicted him of the fraud charges related to the Rubin contract.

### 3.     Rubin's testimony before the grand jury.

During the course of the Fumo investigation, in 2006, Rubin was interviewed by the FBI, and testified before the grand jury.  (The Fumo trial jury was not advised of these facts, as Rubin did not testify at trial.)  Significantly, during the interview, on March 23, 2006, and in his grand jury testimony, on March 28, 2006, Rubin did not tell the story that Fumo later presented at trial, *i.e.*, that Rubin was paid for consulting with Fumo.

---

[4]   Palermo was paid $287,000 under an SDAC contract from 1999 through 2004, purportedly for transportation consulting advice.  The Fumo jury agreed with the allegation that this was also a no-work contract.  Palermo later agreed to enter a guilty plea to a charge of conspiracy to commit mail fraud, and the parties entered a "C plea" on terms quite similar to those set forth in the Rubin agreement.  The Honorable Stewart Dalzell accepted that agreement and imposed the stipulated sentence on Palermo.

Rather, Rubin presented an account that the Senate contracts really were with B&R for B&R's ordinary services, and that Fumo had no involvement at all.

In actuality, the government would prove if Rubin proceeded to trial, the reason for Rubin's testimony is clear when put in context.  In the government's view, as was the case with many of Fumo's illegal affairs, the B&R contract was specifically designed to create the appearance of legitimacy and avoid the suspicion that Fumo was simply rewarding his friend.  During the grand jury investigation, Fumo and his many loyal supporters parroted a basic story:  that any transaction the government questioned was ordinary, and did not involve Fumo personally.  These accounts were then replaced at trial with entirely new stories once the strength of the government's evidence became known.  As an example, Fumo consistently denied in public statements after the investigation began that he received any benefit from the Citizens Alliance charity, only to completely reverse himself at trial, after the evidence of the extensive benefits poured in, when he testified that he received and deserved much of what the government alleged he took.

Similarly, in 2006, Rubin's account was that B&R performed ordinary work for the Senate staff, and Fumo was not involved.  Then, the government interviewed the staff members, and developed an irrefutable case that the staffers were unaware that Rubin even had a contract, let alone that he was available for their use.  Thus, by the time of trial, a new story was propounded, that Rubin acted as a direct adviser to Fumo (and thus the staff would not necessarily be aware of Rubin's role).

On March 23, 2006, in advance of his appearance before the grand jury, Rubin voluntarily agreed to meet with an assigned prosecutor and FBI agents to discuss the matter.  In relevant part, with regard to the B&R contract, the FBI interview report recounts that Rubin reported:

> RUBIN was the sole point of contact for the work, which included research for neighborhood projects, constituent services and some investigative work.  He received his work assignments from employees in Senator FUMO's Philadelphia District Office and from SUSAN SWETT SKOTNICKI in the Harrisburg office. Neither RUBIN nor his employees kept records of the time spent or work performed on requests from FUMO's employees.  RUBIN never checked to determine whether the contract was profitable for B&R because it was an insignificant client.  The contract abruptly ended a year or two ago and RUBIN wasn't sure why that happened.  He probably had a conversation with someone about the termination of the work, but he is certain it was not FUMO because they never discussed the contract.

Five days later, Rubin appeared before the grand jury.  This is the full text of the relevant part of Rubin's grand jury testimony:

Q.   In the past have you had a contract with the Senate Democratic Appropriations Committee?

A.   Yes.

Q.   And approximately how much annually did you earn from the contract?

A.   30 thousand dollars a year.

Q.   What types of services did your company provide to the Senate Democratic Appropriations Committee?

A.   Well, different types of, there's so many. I know these are some of the things we went over which was a copy of a deed, a search, informational use at City Hall whether it be looking up records.  Part of how we work, and I don't know that we went through this, is that 90 percent of all the clients that B&R has in that particular capacity we make regular stops to those offices.  And I would

15

be the person that, contact person on this contract and the person servicing the Senate office and Senate Appropriations by stopping at the office, whatever.  This was very hard to me to explain.  We were a tool of I guess the Senator's staff for all different types of issues whether it was constituent services, whether it was research on a project that was either being built, going to be built.  It is just a myriad of different things.

Q.    When you say the Senator, are you talking about Senator Fumo?

A.    Yes.

Q.    So from whom would you receive your work assignments?

A.    Most of them from his staff.

Q.    And for this how did you bill for the work that you were providing?

A.    Monthly.

Q.    Monthly?

A.    Yes.

Q.    Was it based on the number of hours that your company spends working on these project?

A.    More of a retainer.  We don't track hours so to speak.  Hourly type.

Q.    You don't track hours at all, correct?

A.    No.

Q.    So the bill would be $2,500 a month?

A.    Approximately.

Q.    When you say approximately what do you mean?

A.    There could be less one month, more one month.  It depends on how many times I felt that I was stopping there, how much I'm spending. But it basically came out to $2,500 a month.

Q.     Did either you or any of your employees keep records of the time you
       actually spent working on projects for Senator Fumo's office?

A.     Just myself and there's no other records.

Q.     So the answer is no?

A.     No.

Q.     So if I wanted to go back to your company and search through the filing
       cabinets and try to find records that reflect the work that was performed I
       would not be able to find any?

A.     No.  But you wouldn't be able to find anything from the other clients in that
       position either.

Q.     And why is that?

A.     Because that's not how we operate.

Q.     How did you come up with $2,500 a month as the amount that your company
       would bill the Senate Appropriations Committee?

A.     I stopped at his office just about everyday.  I probably was stopping there
       more than any other client that I have.  And we have clients that, well, no, I
       have other clients I pass more.  It's very difficult to explain because it is a
       combination of the time spent going to the office and the time spent doing
       actual work.

Q.     What types of constituent services did your company do for Senator Fumo's
       office?

A.     It could be anything from a copy of a deed, to getting a major license, to
       tracking down some old information about some judgment.  They were all
       different types.  I mean everyday was different.  It's not that type of business,
       it's not that we did 400 of this, 300 of that, 200 of this.

Q.     Were you able to determine whether or not this was a profitable contract
       arrangement for your company?

A.     I believe it was profitable.

Q.     What do you base that on?

A.     Just the amount of overhead.  My fixed cost of doing business, which most of
       my costs are fixed.  It certainly filled in the day that if I didn't have it and
       didn't do it we wouldn't of had that income.  So I would say it was profitable.

Q.     Did there ever come a point in time you felt like you were doing more work
       than was warranted by the $2,500 month retainer?

A.     No.

Q.     So why is it that you didn't keep track of your time or your employees' time
       with respect to the work that was done?

A.     We don't for anybody.

Q.     You don't for anyone?

A.     No.

Q.     Well, some of the services that your company, the services that, I think you
       said that your main clients for your B & R Services are lawyers?

A.     Correct.

Q.     And these are law firms that want you to do work, be involved with title
       searches, checking courthouse records?

A.     Correct.

Q.     Also supplying court reporters for doing depositions and things like that?

A.     Correct.

Q.     And a lot of these services you contract out?

A.     Some of them, yes.

Q.     I think you told me you have a staff of court reporters?

A.     Correct.

18

Q.   Who will go to law firms and handle depositions and things like that?

A.   Correct.

Q.   With respect to all of those individual services I assume you have records to reflect the work that was done?

A.   That's correct.

Q.   Because you have to bill, you bill your client by the job?

A.   Those items are billed per whatever the job is and what we do, yes.

Q.   With respect to Senator Fumo's office, did you, do you have records that reflect each job that you work on for his office?

A.   No, because I don't believe we ever did, I don't believe we ever did any court reporting or process services for him.  If we would of that would have been a separate  invoice than this other fee.  That other fee would not have included those types of services.

Q.   Okay.  How many employees besides yourself are there at B&R Services?

A.   I would have to guess but I think 30 maybe.  About 30.

Q.   Were you the primary, were you the primary employee who provided the services to Senator Fumo's office?

A.   Yes.

Q.   Are there any other employees that actually did work for Fumo's office?

A.   Only if I gave them an assignment but they probably wouldn't even know who they were doing it for.  They would just, the work would just come back to me whatever the assignment was.

Q.   Approximately over what period of time did your company have this contract with the Senate Appropriations Committee?

A.   We had it for four or five years.  And I think it stopped approximately two years ago.

Q.     And what was the reason that it stopped?

A.     I believe there were budgetary issues and they just, it just stopped.  I mean I think that that was the reason I was given.

Q.     Who told you that?

A.     I don't remember.  I really don't.  I just know that it was that.

Q.     Because I thought --

A.     They had some issues.

Q.     Because when we talked to you last week --

A.     If I had to guess I would assume it was Sue Swett.

Q.     Because when we talked to you last week you said you didn't know why the contract was ended.

A.     Well, I'm guessing and I said that.  I said I think it is there was some budgetary issues.

Q.     But you're not sure?

A.     I'm not sure.

Q.     Could it have been because of the criminal investigation that's why it was ended?

A.     It certainly could be.

Q.     Do you ever talk to Fumo about why it was terminated, the contract?

A.     No.

Q.     What role did Fumo play in your company receiving this contract award?

A.     I don't think any.

Q.     Why do you think that?

20

A.    I remember, I remember, you know, we're back to the wife issue in dealing with Sue Swett on different things that we did.  I don't remember ever having a conversation with Vincent, with Senator Fumo to give me this contract.

Q.    Well, he's the one who has to approve you getting the contract, doesn't he?

A.    I would think so, I would assume so.  At some point I guess he has.

Q.    There's actually a contract that you have to sign?

A.    Correct.

Q.    And that he has to sign too, right?

A.    I know I signed it.  Don't remember his signature being on it when I signed it.

Q.    It's work exclusively for his office?

A.    Right.

Q.    The work is exclusively for his office, I have no way of knowing sometimes where some of the stuff comes from.  I mean I guess it could come from another office.  I get the assignment from his office.

Tr. at 26-35.

## B.    Rubin's Current Position.

Rubin continues to deny that he defrauded the State Senate by receiving funds for non-legislative purposes.  Rather, he asserts that he spent a significant amount of time during the five-year contract period acting as an adviser to Fumo and as a liaison between Fumo and other government officials and community members.  Since the conclusion of the Fumo trial, both Fumo's defense team (at sentencing proceedings) and Rubin have provided the government with additional statements of witnesses, and what they say are corroborating records (such as phone bills and other receipts) demonstrating that Rubin

21

met with others on Fumo's behalf.  The witness statements assert that Rubin "worked" for Fumo on a variety of issues, albeit without providing details of what was discussed or accomplished.  The matters named include higher education assistance, health care, zoning, judicial appointments, gaming, Children's Hospital financing, Drexel financing, and more.[5]

Besides providing these materials, Rubin also appeared for a proffer, during which he stated, as Fumo had testified at trial, that Rubin earned the payments by acting as Fumo's representative and adviser.  Rubin said that as he spent more and more time on matters for Fumo, his partner at B&R complained about Rubin's absence from B&R. Things with his partner got worse, Rubin said, after Rubin was appointed as a Pennsylvania Turnpike Commissioner in 1999.  The partner demanded a $25,000 increase in his B&R salary to match what Rubin was making as a Commissioner.  When Fumo offered Rubin a $30,000 per year Senate contract in the fall of 1999, Rubin said, he decided on his own to have the contract written in the name of B&R so he could deposit the money into the business.  Rubin hoped this would appease his partner somewhat.

Rubin stated that Fumo had nothing to do with the administrative aspects of drawing up and executing B&R's Senate contract, including the description of the duties to be performed.  That task, he said, was left up to Sue Skotnicki (Fumo's secretary in Harrisburg) and Arnao.  Rubin acknowledged that the description of the duties as written did

---

[5]   The government continues to believe, upon examining the new evidence, that these accounts are after-the-fact renderings regarding affairs that Rubin was involved in regardless of his association with Fumo.

not accurately reflect the bulk of the work he did under the contract.  He said that there were a few occasions when he did do research of the type typically performed by B&R, referring in particular to title information obtained related to a project of a Fumo aide.  But he stated that most of what he did involved consulting directly with Fumo, and he believed he more than earned his money.

Rubin also questioned whether his statements to the grand jury were entirely perjurious, asserting that B&R in fact provided research services to Fumo's Senate staff, and that he received many of his assignments from Fumo's staff.  Rubin further asserts that, given the particular wording of questions and answers before the grand jury, his answers were not literally false as required for application of the perjury statute.

Nevertheless, Rubin admits that he was not forthcoming with the FBI or the grand jury in 2006, and did not provide investigators with a full account of his relationship with Fumo or the basis of his agreement with and work for Fumo.  Accordingly, while continuing to deny any fraud allegation, he admits that he endeavored to mislead the FBI and to obstruct the grand jury proceeding.

C.    **The Plea Agreement**.

The government reached this agreement because it believes that entry of a felony conviction and imposition of this sentence serves its interests.  The plea spares the government extensive additional investigation and trial efforts, and avoids the uncertainty of a trial result.  At the same time, the agreement assures a sentence which may roughly

approximate the sentence even upon conviction of broader charges, and accomplishes another important goal in obtaining restitution for the public payor of funds to Rubin.[6]

The government therefore advocates that the Court accept the plea agreement and impose the stipulated sentence on Rubin for his criminal acts.

Respectfully submitted,

VIRGINIA A. GIBSON
Acting United States Attorney


/s/ John J. Pease
JOHN J. PEASE
Assistant United States Attorney


/s/ Robert A. Zauzmer
ROBERT A. ZAUZMER
Assistant United States Attorney

---

[6]  In the Fumo case, the Court did not impose restitution for the $150,000 paid by the Senate to Rubin, because, after the defense set forth the new evidence regarding Rubin's alleged work, the Court determined that resolution of the dispute would delay sentencing. Thus, in the Rubin agreement, the government obtains as a precondition of sentencing a payment by Rubin of $150,000 directly to the Pennsylvania State Senate.

24

## CERTIFICATE OF SERVICE

I hereby certify that, on the date shown below, I have caused this pleading to be filed electronically with the Clerk of Court.  A copy of this pleading was also sent to counsel on this date by e-mail to the following:

Joseph P. Grimes, Esquire
1230 Brace Road
Cherry Hill, NJ  08034

Barry Gross, Esquire
Drinker Biddle & Reath LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA  19103

*/s/ John J. Pease*
JOHN J. PEASE
Assistant United States Attorney

Date: *March 15, 2010*