IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

UNITED STATES OF AMERICA      : CRIMINAL ACTION NO. 10-141
                              :
              v.              : Philadelphia, Pennsylvania
                              : April 7, 2010
MITCHELL RUBIN                : 10:33 o'clock a.m.
. . . . . . . . . . . . . . . .

ARRAIGNMENT/PLEA/SENTENCING HEARING
BEFORE THE HONORABLE RONALD L. BUCKWALTER
UNITED STATES DISTRICT COURT JUDGE

- - -

APPEARANCES:

For the Government:      JOHN J. PEASE, ESQUIRE
                        ROBERT A. ZAUZMER, ESQUIRE
                        U.S. Attorney's Office
                        615 Chestnut Street
                        Philadelphia, PA  19106

For the Defendant:      BARRY GROSS, ESQUIRE
                        JOSEPH P. GRIMES, ESQUIRE
                        Drinker Biddle Reath, LLP
                        One Logan Square
                        18th and Cherry Streets
                        Philadelphia, PA  19103-6996

- - -

ESR Operator:           Matthew J. Higgins

Transcribed by:         Jo-Anne L. Hutt,
                        Laws Transcription Service

(Proceedings recorded by For The Record Gold digital sound
recording; transcript provided by transcription service.)

- - -

Laws Transcription Service
48 W. LaCrosse Avenue
Lansdowne, PA 19050
(610)623-4178

```
 1              (The following occurred in open court at 10:33
 2    o'clock a.m.)
 3              THE COURT:  Good morning, everyone.  Please be
 4    seated.
 5              MR. GROSS:  Good morning, your Honor.
 6              MR. PEASE:  Good morning, your Honor.
 7              MR. ZAUZMER:  Good morning, your Honor.
 8              MR. GRIMES:  Good morning, your Honor.
 9              THE COURT:  Okay.  All right.
10              Would defense come forward with his client, please,
11    with the defendant?
12              (Pause.)
13              MR. GROSS:  Good morning, your Honor.
14              Barry Gross --
15              THE COURT:  Mr. Gross, Mr. Rubin.
16              MR. GROSS:  -- and Joseph Grimes here on behalf of
17    Mitchell Rubin.
18              THE COURT:  All right.  Mr. Rubin, this is the time
19    set for your change of plea hearing to this charge, or
20    actually your plea to this information.
21              And I have to confess to everybody here, it's been a
22    long time since I've taken a guilty plea.  I've been off the
23    criminal wheel for a long time.  I think I still know how to
24    do it, and if I miss anything, I'll ask counsel to be sure
25    they remind me of anything I might have missed.
```

1             Mr. Rubin, the purpose of what I'm doing here

2    initially is to make sure that you understand what you're

3    doing, that you understand the nature of the charges against

4    you, and that you're doing this voluntarily and of your own

5    free will.  That's the whole reason for this hearing today.

6             And before I do that, I want to know a little bit

7    about you, because all I remember about you is sitting back

8    there in the courtroom during the trial.  I'm not a

9    Philadelphia-based person, so I don't know anything about

10   you, other than what I've read in the paper, or about all the

11   other people involved here.

12            Start out with your age, how old are you?

13            THE DEFENDANT:  58.

14            THE COURT:  And where were you born?

15            THE DEFENDANT:  Philadelphia.

16            THE COURT:  Did you swear him in, Mr. Higgins,

17   before we do this?

18            See, I forgot the first key part of the proceedings.

19   Go ahead.

20            THE CLERK:  Do you want me to do the plea first?

21            THE COURT:  Yes, do that.

22            MITCHELL RUBIN, after having been first duly sworn,

23   was examined and testified as follows:

24            THE CLERK:  Mr. Rubin, you've been charged with

25   Criminal Information No. 2010-141, which charges you with

1    Count 1 with obstruction of justice in violation of Title 18,

2    United States Code, Section 1503.

3            Now, how do you plead to those charges against you,

4    guilty or not guilty?

5            MR. GROSS:  At this point we would ask the Court to

6    enter a not guilty plea, not guilty to the arraignment, and

7    then we were planning now to plead guilty during the

8    colloquy.

9            THE COURT:  Okay.

10            MR. GROSS:  We would also waive --

11            THE COURT:  You waive the presentation of a --

12            MR. GROSS:  Of indictment, yes.

13            THE COURT:  -- of indictment.

14            MR. GROSS:  Mr. Rubin, Mr. Grimes, and myself have

15    all signed that.  We've explained to Mr. Rubin, prior to

16    coming here about the waiver of indictment, and how the

17    Constitution requires that before being indicted for a

18    felony, it has to be presented to a Grand Jury, and he has

19    agreed to waive this.  I feel strongly that he understands

20    the waiver of procedure, and we have gone through it with him

21    in detail prior to today.

22            THE COURT:  Okay.  I have this waiver here.  It has

23    your signature on it, Mr. Rubin.

24            THE DEFENDANT:  Yes.

25            THE COURT:  Do you have any questions about that?

1          THE DEFENDANT:  No, sir.

2          THE COURT:  Do you fully understand what Mr. Gross

3   has represented?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  Okay.  Now, with regard to what we're

6   doing here then, Mr. Gross, would you explain again exactly

7   what --

8          MR. GROSS:  Yes, yes, your Honor.

9          We are here to enter into a -- for Mr. Rubin to

10  plead guilty.

11         THE COURT:  Mm-hmm.

12         MR. GROSS:  It is a negotiated plea.  If the Court

13  accepts it pursuant to 11(c)(1)(C), we would ask the Court,

14  if the Court accepts the plea, we would ask the Court to

15  impose the agreed-upon sentence today.

16         We have waived the preparation of a pretrial

17  sentence report.  We have gone through that in detail with

18  Mr. Rubin.  We've explained that to him.

19         He, in fact, wishes to waive a pretrial sentence

20  report and we would ask that if the Court accepts the plea,

21  and accepts the plea, and accepts the agreed-upon sentence,

22  that he be sentenced today.

23         THE COURT:  What was the business about not entering

24  a plea until --

25         MR. GROSS:  Oh, that was just for the arraignment,

1    but now we're ready to plead guilty.  That was just for the

2    --

3            THE COURT:  Okay.

4            MR. GROSS:  All right.  No, I was not trying to

5    throw a curve ball.

6            THE COURT:  You had me somewhat thrown off there,

7    but go ahead, now Mr. Higgins.

8            THE CLERK:  Mr. Rubin, on the non-guilty plea that's

9    been entered upon the record by your counsel, you have been

10   charged with Criminal Information No. 2010-141, in Count 1

11   with obstruction of justice, in violation of Title 18 of the

12   United States Code, Section 1503.

13           Now, how do you plead to this charge, guilty or not

14   guilty?

15           THE DEFENDANT:  Guilty.

16           THE COURT:  Mr. Rubin, it looks like we've finally

17   gotten things in the appropriate order, which it's supposed

18   to be here.

19           And I want to get back to what I said to you.  The

20   purpose of the hearing was, as you already knew, I want to

21   make sure you know what you're doing, and you understand the

22   charges against you, and the penalty I could impose.

23           I started out by asking a little bit about you.

24   You're 58?

25           THE DEFENDANT:  Yes, sir.

1          THE COURT:  Where were you born?

2          THE DEFENDANT:  Philadelphia.

3          THE COURT:  And tell me a little bit about your

4    schooling, about your educational background?

5          THE DEFENDANT:  I grew up in Northeast Philadelphia,

6    went to Northeast High School, dropped out of high school in

7    12th grade, finished with a G.E.D. and did some college

8    courses at the time at Philadelphia College of Textile.  I

9    did not graduate.

10          THE COURT:  Okay.  Mr. Rubin, what's your date of

11    birth, by the way?

12          THE DEFENDANT:  2/3/52.

13          THE COURT:  52?

14          THE DEFENDANT:  Yes.

15          THE COURT:  Okay.  After you got out of your

16    schooling and so forth, tell me a little bit more about what

17    you did in life.

18          THE DEFENDANT:  My parents were --

19          THE COURT:  How did you make a living?

20          THE DEFENDANT:  -- my parents were very poor.  I

21    started running errands for lawyers, doing filing in City

22    Hall.  I had --

23          THE COURT:  How old were you when you started

24    working for lawyers?

25          THE DEFENDANT:  16, 17 years old.

1          THE COURT:  Okay.

2          THE DEFENDANT:  I copied Police Reports in City

3    Hall, Traffic Accident Reports.  I had other jobs during that

4    time, too, and in the delicatessen business, and restaurant

5    business, but started working that business and started a

6    company called B & R Services in the early '70's that's still

7    in existence.

8          THE COURT:  You were just 30 years old at that time

9    or 20 years old?

10          THE DEFENDANT:  No, I wasn't even 20.

11          THE COURT:  Yes, okay.

12          THE DEFENDANT:  I was, yeah, I wasn't even 20 yet,

13    and started this company that's still in business, still has

14    40 employees plus.

15          THE COURT:  You started B and R --

16          THE DEFENDANT:  B and R Services.

17          THE COURT:  -- Services way --

18          THE DEFENDANT:  Yes.

19          THE COURT:  -- back in --

20          THE DEFENDANT:  Way back in the early '70's.

21          THE COURT:  What did you start doing at that time

22    for lawyers?

23          THE DEFENDANT:  Process serving, court filing.

24    Later on in the '70's I opened up a court reporting service

25    that added to it, and then later added a private detective

1   agency to it, also.  So that was -- that was the start of

2   those businesses.  And then my other businesses all kind of

3   grew around contacts, dealing with the Philadelphia Bar,

4   basically mostly all Philadelphia work.  We do process

5   serving all over the world.

6          THE COURT:  Mm-hmm.

7          THE DEFENDANT:  All over the country.  We belong to

8   different organizations that do process serving all over the

9   country and everything else kind of revolved around that that

10  I do.

11         THE COURT:  And how did you get involved in the

12  political world?

13         THE DEFENDANT:  Oddly enough, I worked on several

14  campaigns over the years, and contributed to most judicial

15  candidates, lawyers that were friends of mine that wanted to

16  be judges, and that's how it basically began.

17         THE COURT:  From what you're telling me about your

18  family background, you're the first one in your family to get

19  involved politically?  I mean --

20         THE DEFENDANT:  Yes --

21         THE COURT:  -- your parents --

22         THE DEFENDANT:  -- there's nobody in my family.

23         THE COURT:  -- and nobody.  You got involved --

24         THE DEFENDANT:  There's nobody else.

25         THE COURT:  -- and, of course, being in the business

1    you were in, it kind of naturally happened.

2            THE DEFENDANT:  It was a natural progression.

3            THE COURT:  Mm-hmm.

4            THE DEFENDANT:  It started -- it's like anything

5    else, your Honor, you -- you -- you get involved in

6    campaigns, and, you know, I had a campaign in the early

7    '90's.  Actually, that's where I met Ruth.  I met Ruth at a

8    fundraiser.

9            THE COURT:  Where did you meet Ruth?

10           THE DEFENDANT:  At a fundraiser for a judge, a

11   Supreme Court Justice.

12           THE COURT:  Okay.  And when did you start -- when

13   did you meet Senator Fumo?

14           THE DEFENDANT:  When I met Ruth at the fundraiser.

15           THE COURT:  Okay.

16           THE DEFENDANT:  That was -- I think it was April of

17   1993.  It was the Supreme Court race for Justice Nigro.

18           THE COURT:  Was your wife -- she wasn't your wife --

19   Ruth at the time, was she working at -- for Senator Fumo at

20   that time?

21           THE DEFENDANT:  Yes, she was.

22           THE COURT:  She was, yes.  The dates and times that

23   have transpired in this case and have become somewhat lost in

24   my mind, because I haven't thought about this case for a

25   long, long time, but that was -- at that time in 1992, '93,

1   you met Ruth.

2          Was she working down at his office then?

3          THE DEFENDANT:  Yes, she was.

4          THE COURT:  And did they have the office down Tasker

5   Street then?

6          THE DEFENDANT:  Yes, they did.

7          THE COURT:  Okay.  All right.  And, thereafter, when

8   was it that you were appointed to the Turnpike?

9          THE DEFENDANT:  It was either -- it was either -- I

10  know it was in June.  It was either 1998 or 1999.

11         MR. GROSS:  Mm-hmm.

12         THE DEFENDANT:  I'm pretty sure it was 1998.

13         THE COURT:  Mm-hmm.  Now, these charges you're

14  pleading guilty here or the charge you're pleading guilty to

15  is obstruction of justice.

16         THE DEFENDANT:  Yes.

17         THE COURT:  And in order for you to be found guilty

18  of that, the Government would have to prove beyond a

19  reasonable doubt that you corruptly influenced, obstructed,

20  or impeded, or endeavored to influence, obstruct, or impede

21  the due administration of justice, and that you knew there

22  was a pending judicial proceeding at the time you did that.

23         The penalties the Court can impose for that count,

24  or for that charge, is a term of ten years imprisonment,

25  three years of supervised release, a fine of $250,000, and a

1  $100 Special Assessment.

2          Now, with regard to that charge that's been brought

3  against you, Mr. Rubin, you've entered into a plea agreement

4  here.

5          THE DEFENDANT:  Yes.

6          THE COURT:  And obviously that plea agreement has a

7  great bearing on what might happen here, so I'm going to ask

8  that the Government to state the terms of the plea agreement.

9          Before that I'll Mr. Pease, if you would come

10  forward here, to state the factual basis for the plea, and

11  then the plea agreement, if you would?

12          MR. PEASE:  Yes, thank you, your Honor.

13          Your Honor, with respect to the plea agreement that

14  we've submitted to the Court, we've stipulated to certain

15  facts that will form the factual basis for the plea --

16          THE COURT:  And not --

17          MR. PEASE:  -- of guilty to this obstruction of

18  justice count.

19          THE COURT:  Yes, yes.

20          MR. PEASE:  And it's Attachment A to our plea

21  agreement, and I'll go through it quickly, your Honor, if

22  it's okay with you.

23          THE COURT:  Well, all I want to do is, you know, for

24  the record we have to have the statement of facts --

25          MR. PEASE:  Yes.

1           THE COURT:  -- on which the plea is based, so...

2           MR. PEASE:  Your Honor, the stipulated factual basis

3    is as follows:  From 1985 through 2007, Pennsylvania State

4    Senator Vincent Fumo was the chairman of the senate

5    democratic appropriations committee.  In this capacity, he

6    controlled a large budget, which was approximately $5 million

7    annually during the relevant time period, part of which he

8    used to pay contractors for purported service to the S.D.A.C.

9           As a public official, and member of the senate, Fumo

10   was obligated to avoid the use of senate funds and resources

11   for the personal or political benefit of himself or others.

12          Beginning in 2003, federal authorities, under the

13   auspices of a Federal Grand Jury, conducted an investigation

14   to determine, among other matters, whether Fumo abused his

15   authority regarding the use of senate funds.

16          At all times material to the Fumo investigation,

17   Defendant Rubin was a 50 percent shareholder of a firm B and

18   R Professional Services, Inc., which I'll refer to as B and

19   R, which provided court reporting, process serving, and

20   document retrieval services to attorneys.

21          On or about October 1st, 1999, the S.D.A.C. chaired

22   by Fumo entered an annual professional services contract with

23   B and R Professional Services, Inc.  The contract provided

24   that Rubin, through B and R, would provide the following

25   services:

1      "Professional services to the democratic

2  appropriations committee to include, but not limited to

3  research, analysis, and make recommendations on legislative

4  matters, assist on constituent services.  Payment to be

5  billed by invoice for these services performed.  Consultant

6  is to be reimbursed for expenses incurred to these services."

7      The annual amount paid under this contract was

8  $30,000 per year beginning on October 1st, 1999.  The annual

9  contract was renewed four times.  And the last contract

10  concluded on September 30th, 2004.

11      During the Fumo investigation in 2006, federal

12  investigators endeavored to determine whether the B and R

13  contract was a legitimate S.D.A.C. contract for services

14  relating to official senate business, or was an improper

15  payment of public money.  Federal investigators issued a

16  Grand Jury subpoena to Rubin and B and R seeking all

17  pertinent records in the possession of Rubin and B and R,

18  bearing -- excuse me -- bearing on the Fumo investigation and

19  further sought to interview Rubin regarding the S.D.A.C.

20  contract awarded to B and R.  Rubin voluntarily agreed to be

21  interviewed, and later to appear as a witness before the

22  Grand Jury.

23      Matters that were material to the Fumo investigation

24  included the specific circumstances that led to the award of

25  the S.D.A.C. contract to Rubin and his company, B and R, the

1  types of services that were to be provided under the terms of

2  the contract, Rubin's relationship with Fumo, and the

3  specific nature and scope of the actual work that Rubin

4  performed under the terms of the S.D.A.C. contract.

5          On or about March 23rd, 2006, Rubin, in an interview

6  with F.B.I. agents assigned to the Fumo investigation, failed

7  to fully and honestly respond to questions about the scope of

8  services performed under B and R's contract with the

9  S.D.A.C., and about the nature of his relationship with

10  Senator Fumo.

11          In doing so, Rubin intentionally withheld material

12  facts and other information material to the investigation,

13  and thereby obstructed and impeded the due administration of

14  justice in Grand Jury Matter No. 03-123.

15          Mr. Rubin has now admitted to investigators that he

16  was not forthcoming with the F.B.I. in the 2006 interview.

17  Accordingly, Rubin admits that he endeavored to obstruct the

18  Grand Jury investigation and has agreed to plead guilty to

19  one count of obstruction of justice.

20          THE COURT:  Mr. Rubin, before you appeared here

21  today, you read that statement of fact -- statement of the

22  factual basis, did you not?

23          THE DEFENDANT:  Yes.

24          THE COURT:  That's attached here?

25          THE DEFENDANT:  Yes, your Honor.

 1              THE COURT:  And is that what you're admitting to
 2    having done?
 3              THE DEFENDANT:  Yes, your Honor.
 4              THE COURT:  And let me see.  Is there anything else
 5    here?
 6              (Pause.)
 7              Mr. Gross, is there anything else you want to say
 8    with regard to that factual statement?
 9              MR. GROSS:  No, your Honor.
10              THE COURT:  Okay.
11              MR. GROSS:  We believe that accurately --
12              THE COURT:  And are you, as counsel, satisfied that
13    that statement forms a basis for this guilty plea?
14              MR. GROSS:  Yes, we are.
15              THE COURT:  I've read through them again here after
16    listening to Mr. Pease's presentation, and I think it does
17    form a factual basis for the plea, so I'm going to accept the
18    change of plea to guilty on the count of obstruction of
19    justice.
20              Mr. Pease, what's the plea agreement here --
21              MR. PEASE:  Yes, your Honor.
22              THE COURT:  -- for the record?
23              MR. PEASE:  Your Honor, I'll summarize the essential
24    terms of the plea agreement.
25              First, Mr. Rubin has agreed to plead guilty to one

1   count of obstructing justice in violation of Section 1503 of

2   Title 18.

3          We have agreed specifically that this agreement is

4   made pursuant to Rule 11(c)(1)(A) of the Rules of Criminal

5   Procedure, and that the Government won't bring any additional

6   charges against Mr. Fumo arising from Grand Jury Matter No.

7   03-123.

8          THE COURT:  You said Mr. Fumo.

9          MR. PEASE:  The Government -- I'm sorry -- what did

10  I say?

11         THE COURT:  You said Mr. Fumo.

12         MR. PEASE:  Oh, I'm sorry.  I meant -- it's a force

13  of habit, your Honor.

14         THE COURT:  Yes.

15         MR. PEASE:  I'm sorry.

16         Mr. Rubin.

17         THE COURT:  Yes.

18         MR. PEASE:  The defendant and his counsel further

19  agree that the plea agreement is made pursuant to Rule

20  11(c)(1)(C), and have agreed to the following specific

21  sentence as the appropriate disposition of the case.

22         Five years probation with the first six months to be

23  served in home confinement with electronic monitoring, costs

24  to be paid by the defendant.

25         During this six-month period of home confinement,

1  defendant will be permitted to leave his home to go to work

2  from 7:00 in the morning until 7:00 p.m. Monday through

3  Friday, and for additional time requested for work-related

4  activities as the Probation Office deems appropriate, to

5  complete his community service obligation, to attend

6  religious services, to receive medical treatment, to meet

7  with his counsel.

8         In addition, the defendant shall be permitted to

9  leave his home for a total of four hours each week, including

10  weekends, in order to attend to personal chores and to visit

11  family members.

12         The defendant agrees to serve 150 hours of community

13  service.  He agrees to make a payment of $150,000 to the

14  Senate of Pennsylvania.  This payment will satisfy all

15  restitution, fines, and penalties in this matter, exclusive

16  of the Special Assessment.

17         Defendant makes this payment without any admission

18  of any liability to the Senate of Pennsylvania, but makes

19  this payment to settle and compromise any claim which may be

20  asserted against him by any claimant for such restitution.

21         The defendant agrees that this payment shall be made

22  prior to the date of sentencing.  In fact, we received a

23  check today from Mr. Rubin's counsel for the $150,000 which

24  we will provide to the Senate of Pennsylvania tomorrow.

25         He agrees to pay a Special Assessment of $100 before

1    the time of sentencing and will provide a receipt from the

2    clerk that he has done so.

3         We also agree as part of the sentence that no period

4    of supervised release beyond this period of probation would

5    be imposed.

6         If the Court rejects this agreement, it is agreed

7    that the defendant will be advised of the Court's rejection

8    of the plea agreement, and that the defendant will have the

9    opportunity to withdraw his plea pursuant to Rule 11(c)(5) of

10   the Rules of Criminal Procedure.

11        If the defendant elects not to withdraw his plea,

12   then this plea agreement will automatically convert to an

13   agreement under Rule 11(c)(1)(B), and this specific sentence

14   will be the joint recommendation of the parties, although not

15   binding on the Court.

16        There are two other essential terms of the agreement

17   I want to cover if I can, your Honor, in detail?

18        THE COURT:  Mm-hmm.

19        MR. PEASE:  If the plea agreement is accepted by the

20   Court, or if the Court rejects the plea agreement, but the

21   defendant doesn't withdraw his plea, then the defendant

22   voluntarily and expressly waives all rights to appeal, or

23   collaterally attack his conviction, sentence, or any other

24   matter relating to the prosecution, whether such a right of

25   appeal -- right to appeal or collateral attack arises under

1   18 U.S. Code, Section 3742, or 28 U.S. Code, Section 1291 or

2   2255, or any other provision of law.

3        The defendant specifically waives any right to

4   assert in any appeal or any collateral proceeding that the

5   information fails to state an offense under federal law.

6   Notwithstanding the waiver provision I've just described.

7        If the Government appeals from the sentence, then

8   the defendant may file a direct appeal of the sentence.  If

9   the Government does not appeal, then notwithstanding this

10  waiver provision, the defendant may file a direct appeal, but

11  raise only claims that;

12       1, his sentence on any count of conviction exceeds

13  the statutory maximum for that count;

14       2, that the sentencing judge erroneously departed

15  upward pursuant to the Sentencing Guidelines;

16       Or, 3, the sentencing judge exercising the Court's

17  discretion pursuant to United States v. Booker imposed an

18  unreasonable sentence above the final sentencing guideline

19  range determined by the Court.

20       If the defendant does appeal pursuant to this

21  paragraph, no issue can be presented by the defendant on

22  appeal other than those described in this paragraph.

23       And then I want to talk about Paragraph 9 of our

24  agreement as another essential term.

25       Except in the event that the Court rejects this plea

1   agreement, and the defendant elects to withdraw its plea, the

2   defendant waives all defenses based on any Statute of

3   Limitations applicable to the information to be filed

4   pursuant to this agreement.

5          The defendant agrees that this -- the prosecution of

6   the defense described in Paragraph 1, that is the obstruction

7   of justice offense, above is timely as of the date that this

8   agreement is signed, and as of the date that the guilty plea

9   will be entered in this court.

10          In the event that this agreement is not consummated

11   or it's rejected by the Court, and the defendant elects to

12   withdraw its plea, or is otherwise not fully carried out, the

13   defendant waives all defenses based on any Statute of

14   Limitations with respect to the charge set forth in the

15   information to be filed pursuant to this agreement, and with

16   respect to any other charge relating to the Senate Democratic

17   Appropriations Committee contract with B and R Professional

18   Services, Inc.

19          If such a charge is filed within 90 days from the

20   latest of any of these three events, any of these four

21   events, A, the defendant's guilty plea is not accepted by the

22   Court for any reason, B, that the conviction is later vacated

23   for any reason, C, the defendant violates this agreement, or,

24   D, the defendant's plea is later withdrawn.

25          Those are, your Honor, the essential terms of the

22

1   agreement and the agreement is appended to the guilty plea

2   memo we filed in court.

3          THE COURT:  All right.  Mr. Rubin, obviously you've

4   read this agreement?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  And you've gone over it with your

7   counsel?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  Now, there are substantial waivers in

10   this agreement.  One of the substantial waivers is your right

11   to, for all practical purposes, you can't appeal from the

12   sentence that I impose, if I impose it under this agreement.

13          You understand that?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  There may be some obscure appeal right

16   out there, but for all practical purposes, you waive any

17   right to appeal.

18          Do you understand that?

19          THE DEFENDANT:  Yes, your Honor.

20          THE COURT:  And, also, you've waived any Statute of

21   Limitations -- you waive all defenses based on any Statute of

22   Limitations applicable to the information.  You've agreed

23   that the prosecution defense is timely.

24          Do you understand that?

25          THE DEFENDANT:  Yes, your Honor.

1          THE COURT:  Counsel, have you explained these

2     matters to the defendant, because they are somewhat

3     technical, and they deserve a --

4          MR. GROSS:  Yes, we have, your Honor.  We have

5     explained it to him.  Throughout Mr. Rubin has agreed to

6     things.  The waiver of the Statute of Limitations basically

7     came about because we were in long negotiations with the

8     Government --

9          THE COURT:  Mm-hmm.

10          MR. GROSS:  -- and to allow this to come to the

11    resolution, so both parties would have enough time to resolve

12    it, we agreed to waive the Statute of Limitations for a

13    certain period of time.

14          THE COURT:  Okay.

15          MR. GROSS:  So that was both not only to the

16    Government's advantage, but to Mr. Rubin's advantage, so we

17    could come to a resolution.

18          THE COURT:  Okay.

19          MR. GRIMES:  And, Judge, if I could add, there were

20    written tolling agreements that were actually executed

21    between the Government and Mr. Rubin, which we explained to

22    Mr. Rubin, so they're part of the Government's file in this

23    case.

24          THE COURT:  All right.

25          The only reason I'm taking a long time with this is

1  because it's a felony you're pleading to, Mr. Rubin, and I

2  want you to be aware of -- I want to be sure you know all

3  that you've done here in this agreement, and if you have any

4  questions about it you felt haven't been satisfactorily

5  explained by your counsel or me, please, please ask, okay?

6          I want to ask you one other thing with regard to the

7  agreement.  There's a two-page form here about your

8  Acknowledgement of Rights, and you've signed that

9  Acknowledgement of Rights.  It has to do with your right to a

10  trial and everything else that goes along with any defendant

11  who pleads guilty before me has all those constitutional

12  rights.

13          THE DEFENDANT:  Yes.

14          THE COURT:  Have you read them?

15          THE DEFENDANT:  Yes.

16          THE COURT:  And understand them?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Does the Government agree that I don't

19  have to go into those rights specifically with the defendant

20  in this case, or would you prefer that I do?

21          MR. PEASE:  I would prefer if you would, your Honor.

22          THE COURT:  Okay.  Then I'll go through these with

23  you, Mr. Rubin.

24          You, of course, understand initially the first

25  matter is you don't have to plead guilty, and then if you

1    plead -- and you could plead not guilty and insist upon a

2    trial.  And at the trial you would have the right to be tried

3    by a jury that would be selected from the Eastern District,

4    and along with your attorneys, you could have the right to

5    participate in the selection of that jury.

6          You also understand that a jury could only convict

7    you if all 12 jurors agreed that they were convinced of your

8    guilt beyond a reasonable doubt, and that throughout these

9    proceedings, the Government has the burden of proving beyond

10   a reasonable doubt each and every element of the crime with

11   which you are charged.

12         You have a presumption of innocence, and that

13   presumption of innocence stays with you throughout the entire

14   trial, and unless and until a jury is convinced beyond a

15   reasonable doubt that the Government has proven you guilty.

16         You have a right to be represented by a lawyer at

17   trial, and the appeal following a trial, and if you cannot

18   afford to hire a lawyer, the Court would appoint one for you

19   free of charge.  And through your lawyer, you would have the

20   right to cross-examine every witness who took the stand

21   against you.  You can also testify in your own defense if you

22   have a trial, and you could subpoena witnesses to testify in

23   your defense if you wanted to.

24         As far as your right to testify is concerned, if you

25   exercise the right not to testify, that cannot be held

1   against you in any way.

2          (Pause.)

3          Now, when you plead guilty, you have no trial, and

4   you are giving up, in effect, all the rights which I have

5   just explained to you.

6          Do you have any questions about your constitutional

7   rights?

8          THE DEFENDANT:  No, your Honor.

9          THE COURT:  You've signed that form and your

10  attorneys have gone over it --

11         THE DEFENDANT:  Yes, I did, your Honor.

12         THE COURT:  -- with you?

13         THE DEFENDANT:  Yes, they did.

14         THE COURT:  Are you satisfied with the services to

15  date that Mr. Gross and Mr. Grimes --

16         THE DEFENDANT:  Very satisfied.

17         THE COURT:  -- have performed on your behalf?

18         THE DEFENDANT:  Very satisfied, your Honor.

19         THE COURT:  Okay.  And I take it, as you stand

20  before me here today, Mr. Rubin, you're not under the

21  influence of any drugs, or any medicine, or anything of that

22  type that would interfere with your ability to understand

23  what's going on here today?

24         THE DEFENDANT:  No, your Honor.

25         THE COURT:  Okay.  Do the counsel for the Government

1  have any additional questions on the colloquy?  Please feel

2  free to ask them, Mr. Pease, if you do.

3          MR. PEASE:  No, your Honor, I have no other

4  questions to suggest, other than the Court obviously will

5  make factual findings that he's competent, understands his

6  rights --

7          THE COURT:  Yes.

8          MR. PEASE:  -- and is freely giving up those rights.

9          THE COURT:  I will make those findings in a moment.

10         I wanted to address the issue of the presentence

11 report before we go any further.

12         Is the Government satisfied that -- apparently the

13 defendant wants to waive a presentence investigation, but I

14 don't do that unless the Government agrees?

15         MR. GROSS:  We don't have any objection to it, your

16 Honor.

17         THE COURT:  You have no objection to it.

18         MR. PEASE:  We don't object to it, no.

19         THE COURT:  All right.  Mr. Rubin, based upon what

20 has taken place here today thus far, I'm satisfied that

21 there's a factual basis for the plea, and that clearly based

22 upon your background, you're competent to enter this plea

23 here, and you understand what you're doing.

24         THE DEFENDANT:  Yes, your Honor.

25         THE COURT:  And I also think, because you told me

1    so, and because there's no other indication to the contrary,

2    that you're doing it voluntarily and of your own free will;

3    am I correct about that?

4            THE DEFENDANT:  Yes, your Honor.

5            THE COURT:  Okay.  Then I'm going to accept the

6    guilty plea and talk to you about one more thing here, and

7    that is your waiver of -- is there a written waiver of the

8    presentence investigation or is it just oral?  I mean I don't

9    --

10           MR. GROSS:  It's oral, your Honor.

11           THE COURT:  You're entitled to have a presentence

12   investigation here, and really you're the only one that can

13   say I don't want it, and even then the Court doesn't have to

14   accept that, but the purpose of a presentence investigation

15   is for me to find out things about you.  Good things, bad

16   things, whatever there is to find out about you.  And in a

17   typical case, it's of great assistance to the judge in

18   determining what the appropriate sentence should be.

19           Now, in a case where a plea agreement is presented,

20   the parties have already determined what they think is the

21   appropriate sentence, so the presentence investigation

22   sometimes isn't necessary, particularly where it calls for a

23   sentence that's probation and not incarceration, which is

24   this case.

25           Now, do you want to have a presentence investigation

1  or are you satisfied that I know enough about you that I can

2  proceed to sentence you without presentence investigation?

3          THE DEFENDANT:  I'm satisfied, your Honor, that

4  you're more than fair to handle this --

5          THE COURT:  Yes.

6          THE DEFENDANT:  -- without it.

7          THE COURT:  And your attorneys have already told me

8  that they've agreed to the waiver, I guess, and --

9          MR. GROSS:  Yes, your Honor, and we have gone

10  through this with Mr. Rubin.  We've gone through the factors

11  under 3553, and we feel that the proposed sentence is clearly

12  justified, or that there's factors under 3553 which clearly

13  justify that proposed sentence.

14          He has no criminal history, as the Court knows, and

15  the Court has saw him in court for two or three months.  You

16  obviously did the presentence investigation concerning his

17  wife, so you know about his family, and the support from his

18  family, and he has a record of developing companies, and

19  working for close to, I would say, over 40 years.  So he has

20  been clearly someone who has contributed to the community,

21  and has worked hard, and we feel that this sentence clearly

22  would fulfill that --

23          THE COURT:  The sentence, of course, does depart

24  from the guidelines.  I think the guideline calculation is

25  what, ten to --

1          MR. GROSS:  I think it was ten to 14 months.

2          THE COURT:  And the parties agreed to --

3          MR. PEASE:  Ten to 16.

4          MR. GROSS:  Ten to 16 months, your Honor.

5          THE COURT:  Ten to 16 months, and the Government, in

6    their memorandum, felt that under the circumstances, they

7    were not objecting to that departure, obviously, because they

8    entered into this plea.

9          And what was substantially the reason for you

10   feeling that way, Mr. Pease?

11         I know it's in your brief, trial memorandum, your

12   very thorough guilty plea memorandum.

13         MR. PEASE:  Well, your Honor, and I'll just very

14   briefly summarize, because we have about 20 pages explaining

15   our rationale in the case.

16         THE COURT:  It was in there.

17         MR. PEASE:  There are a number of competing issues

18   here.  The parties have substantial disagreements about some

19   of the facts, and those relate to what, if any, services were

20   provided relating to that senate contract.  Following the

21   conclusion of the Fumo trial, we received through counsel

22   additional records that they contend support that Mr. Rubin

23   actually provided services to Mr. Fumo under the contract,

24   that would present difficult and challenging issues, the

25   trial proceedings could be complex.

1        This plea agreement resolves one thing at least the

2   parties do agree about, which is that Mr. Rubin obstructed

3   justice in the course of the investigation.  It provides

4   restitution, which in the Government's view, is owed to the

5   Senate of Pennsylvania without requiring Mr. Rubin to agree

6   that it's restitution.  It provides for an opportunity to

7   impose community service.  There's a home detention period.

8   And given the costs and challenges and difficulties of

9   proceeding in a trial where the result could be uncertain as

10  to at least the contract part of the case, we believe this

11  plea agreement is in the public interest and satisfies the

12  Government and its objective of trying to resolve these

13  complex issues and pursue this case through a criminal

14  process.

15        THE COURT:  Okay.  I can't find the last two pages

16  of your memorandum, but I think that's --

17        MR. PEASE:  I have them here, your Honor.

18        THE COURT:  -- that's where you set forth the reason

19  for your -- and I just wanted to go over that with you.

20        (Pause.)

21        And that's substantially what you said.  It spares

22  the Government expense for additional investigation, and

23  trial efforts, and avoid the uncertainty of the trial.  And

24  the agreement may roughly approximate the sentence even upon

25  a conviction of the charge.

1          So that's essentially your reasons?

2          MR. PEASE:  Yes, it is, your Honor.

3          THE COURT:  Mr. Gross, before I begin the

4   sentencing, I let the attorney tell me something about his

5   client that is a reason why, you know, I should give what the

6   parties are recommending here.

7          Tell me a little bit about, what has your client

8   done in the past?

9          MR. GROSS:  Well, your Honor, he has, as the Court

10  has heard, he started a business, he was very successful

11  starting two businesses, he raised three children who are all

12  successful, two of whom are attorneys, he has worked for over

13  40 years, he has done enormous good to the community.

14          I can tell you on a personal level, I've never had a

15  situation like this when the word got out that I was

16  representing Mr. Rubin, along with Mr. Grimes and Mr.

17  Chadwick, I had between ten and 15 lawyers in the first week

18  or two call me up and praise Mr. Rubin --

19          THE COURT:  Mm-hmm.

20          MR. GROSS:  -- and tell me I better do a good job.

21  It was an outpouring which I had never been exposed to and --

22          THE COURT:  You mentioned about a service to the

23  community.  What's that?

24          MR. GROSS:  Yes.  Well, he has -- he's done a lot

25  for youth sports.  He has done a lot for youth in the

1    community.  When his children were young, he was very active.

2    And, you know, he has just really developed this business and

3    is -- and I would say the type of person he is, and I asked

4    him not to do this, and we had to sort of push away people

5    because I wanted to -- we wanted to streamline this process.

6    But it was one of these situations where we asked -- send out

7    the word to dozens if not hundreds of people to not send

8    letters of support, and not to fill the courtroom, and it was

9    because of the agreed-upon sentence, and to streamline the

10   proceedings.  To not burden the Court or the Government with

11   having to go through hundreds and hundreds --

12            THE COURT:  Mm-hmm.

13            MR. GROSs:  -- of letters, but it was clearly

14   something which we could have clearly filled this room, and

15   probably the ceremonial courtroom.  But a decision was made

16   to -- and one of the reasons obviously, we wanted to

17   streamline this.

18            As the Court well knows, Mr. Rubin and his family

19   have been through a lot, and basically in an effort to just

20   streamline this and get this behind them, so he and his wife,

21   when she is released, and reestablish their lives.

22            THE COURT:  Mm-hmm.

23            MR. GROSS:  He visits his wife, Ruth Arnao, in

24   Lexington at the Federal Medical Center, the camp every

25   weekend.  He flies down on Friday.  He is there on Friday and

1  Saturday.  He almost always bring family members, her family

2  members, his family members, you know, in-laws.  He's down

3  there every weekend.  He, in a sense, is her lifeline and

4  they -- and has, without question, has been supporting her

5  and back and forth.

6         It's one of the nuances when we come t sentencing

7  that we want to talk about, about the importance of the

8  visits and them living together.

9         So this has been a situation where we feel the --

10  this sentence resolves everything, and allows Mr. Rubin and

11  his family to put this behind them and to really go on, to go

12  on in their lives and to live his life as he has his entire

13  life except, you know, we're talking about an incident that

14  happened on March 23rd, 2006, which was clearly an aberration

15  in his life.

16         He acknowledges it, he acknowledges that he did

17  wrong, and really this is an effort to move beyond this, so

18  he and his family can re-establish their lives.

19         THE COURT:  Mr. Rubin, is there anything you wish to

20  say before I decide what I'm going to do here?

21         THE DEFENDANT:  No, your Honor.

22         Just that I'm sorry.

23         THE COURT:  Excuse me?

24         THE DEFENDANT:  I'm sorry.  That's all I can say.

25         THE COURT:  Well, I've had -- I'm not going to

1  belabor this, because I've had a lot of time to think this

2  over.

3          Mr. Rubin, I think you're a lucky man in getting

4  this agreement, because while I'm perhaps lenient as a Judge,

5  I've always been upset by people who actually work for the

6  Government, which you did.  You were on the Turnpike

7  Commission.  And probably nothing upsets a judge more than

8  when a Government worker violates the law.  It's really -- so

9  I agonized probably more than I should have over this, as to

10  whether or not I should accept it.

11          There's a couple reasons why I'm going to accept it.

12  The primary reason is the Government, who has -- involves and

13  spends so much time in this case, they've -- they've actually

14  supported this agreement, and agree that it is an appropriate

15  sentence.

16          The other reason is that your attorneys have been

17  very effective in presenting your case.

18          And I suppose the third reason is, Mr. Rubin, that

19  while I don't know a whole lot about you, I've heard enough

20  about you to agree that perhaps this is an ultimately

21  appropriation disposition of this case, and that's based

22  partly on your background, and what you've done with your

23  life, and that you've been -- no record for committing crimes

24  in the past.

25          I'm going to accept the plea agreement with the

1  terms the conditions that are set forth.  The only the point

2  I want to make in doing that is I want to emphasize to you,

3  it's not set forth in the plea agreement, it might be set

4  forth somewhere, but I want to emphasize to you that these

5  terms of probation are to be strictly complied with, and if

6  you goof up on them in any way, fail to comply with these

7  terms and conditions, then the chances are that I won't look

8  upon the violation very lightly.

9           Do you understand that?

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  And before I impose sentence, is there

12  something else?

13          MR. GROSS:  Well, your Honor, there's a number of

14  nuances about this sentence, and I think it's clearly because

15  this is a unique situation where Mr. Rubin's wife is

16  incarcerated, and he visits her every weekend, and he is due

17  to -- she is due to be released from Lexington on May 14th,

18  and Mr. Rubin is scheduled to go down, bring her back to the

19  Philadelphia area, so then she would then go into the halfway

20  house.  And we had asked that the six months --

21          THE COURT:  Is that going to be here in

22  Philadelphia?

23          MR. GROSS:  Yes, it is, your Honor.

24          So we are asking that the six month period of home

25  detention not begin until May 17th to allow Mr. Rubin to

 1   continue, I guess most importantly, to continue to visit his

 2   wife at Lexington, and the Government has told me that if

 3   asked, they have no opposition to him continuing to visit his

 4   wife at the institution.

 5           THE COURT:  Nor to the May 17th date, no objection

 6   to that?

 7           MR. GROSS:  That's correct, your Honor.

 8           MR. PEASE:  We have no objection, your Honor.

 9           THE COURT:  All right.

10           MR. GROSS:  So he could continue, in a sense, to go

11   down and be her lifeline in a sense, and continue to help her

12   when she has to come back into it.  Obviously the adjustment

13   she has to make after her incarceration.  So we'd ask it not

14   be imposed until May 17th.

15           We'd ask that there be no restrictions placed, or

16   that the Court would be asked, and this is something we're

17   going to speak to Ms. Arnao's lawyer about, Mr. Egan, and he

18   may, in fact, have to contact the Court on this, that we may

19   need something sent to the Bureau of Prison.  I know the

20   Government has no objection to him continuing to be able to

21   visit her at the institution, and we may ask the Court's

22   indulgence, if the Court would consider, if asked by the

23   Bureau of Prisons also, showing its support to allow him to

24   continue to visit her.

25           And, also, the nuance when she gets home from the

1   halfway house, since Mr. Rubin will have been convicted of a

2   felony, and Ms. Arnao will be convicted of a felony, that he

3   be allowed to visit her in the halfway house, and nothing

4   about their convictions would stop them -- Ms. Arnao, when

5   she's at the halfway house, to be able to come home to their

6   home, because obviously the usual prohibition of about

7   probation that you cannot associated with another person

8   who's been convicted of a felony, would be impossible here,

9   since they are husband and wife.

10          And one other thing that we are going to tell the

11   Probation Department of.  I spoke to Mr. Hassinger and we're

12   going to tell the supervisor that Mr. Rubin, as the Court has

13   heard I'm sure during the testimony of the other trial and

14   today, his job is not something where he goes to an office.

15   It's akin to in a sense a traveling salesman.  That's how he

16   built his business for the last 40 years, from the time he

17   was 16, where he makes -- he goes around the law offices, he

18   has to be visible, he makes calls all day, both telephone

19   calls and personal calls, so it's something we're going to

20   work with the Probation Department to let them know that

21   during this period of 7:00 a.m. to 7:00 p.m., he's not going

22   to be in an office, but he will be visiting other offices,

23   both in Pennsylvania and New Jersey.

24          THE COURT:  I don't have any problem with that.

25   However, it must be -- and I will impress upon Mr. Rubin,

1  that these terms of the five year probation are the terms I'm

2  imposing, so it's, you know, when I say 7:00 a.m. to 7:00

3  p.m., that's the time.  If he's out working at that period of

4  time, that's fine, that's what he's out doing.  But he has to

5  be back by 7:00 p.m. or he's in violation.  That's the

6  problem.

7         MR. GROSS:  And we've made it clear to Mr. Rubin.

8         THE COURT:  Okay.

9         MR. GROSS:  And, your Honor, I think we all wold be

10  shocked if there was ever a violation.

11         THE COURT:  Oh, yes, I would be, too, but I just

12  want to make clear that we're not -- this isn't -- is not --

13  I'm very serious about this home confinement, because he's

14  getting a huge break in my mind by not going to jail, and I

15  expect these terms to be followed completely.

16         MR. GROSS:  And we agree.

17         THE COURT:  No fudging, no nothing, and the

18  Probation Office knows that, and that's the way it will be

19  conducted.

20         MR. GROSS:  Absolutely, your Honor.  And we have

21  spoken to Mr. Rubin, and Mr. Rubin understands that, and

22  clearly will comply with all --

23         THE COURT:  Yes.

24         MR. GROSS:  -- the rules of probation.

25         THE COURT:  Okay.  Well, with regard to the other

1  item you mentioned, that's always been a consideration or a

2  condition of a probation, that they not associate with other

3  felons, or criminals, but in this case that's waived as to

4  Ms. Arnao, who also has a conviction --

5          MR. GROSS:  Thank you, your Honor.

6          THE COURT:  -- of a felony here in this case.

7          All right.  The sentence of the Court then is that

8  the defendant be placed on probation for a period of five

9  years, and that beginning May 17th, 2010, and for six months

10  thereafter he'll be -- he'll be in home confinement with

11  electronic monitoring paid by the defendant.  And during that

12  six-month period of confinement, he shall not be permitted to

13  leave his home.  He shall be permitted to leave his home to

14  go to work from 7:00 a.m. until 7:00 p.m. Monday through

15  Friday, and for such additional time requested for

16  work-related activities that the Probation Office deems

17  appropriate.  Although in that regard, I would only modify

18  the agreement to say that it's unlikely that there be any

19  modifications made there.

20          He's also, in accordance with the sentence, in

21  accordance with the plea agreement set forth here, that he

22  may complete his community service obligation, to attend

23  religious services, to receive medical treatment, and to meet

24  with his counsel.  These are the times when he is -- things

25  he's allowed to do while he's on this six-month home

1    confinement.

2              In addition, the defendant may leave his home for a

3    total of four hours each week, including weekends, in order

4    to attend personal chores and to visit family members.

5              A second condition of the probation is that he

6    perform 150 hours of community service.

7              The third condition is he pay $150,000 to the Senate

8    of Pennsylvania.  This payment will satisfy all restitution,

9    fines, and penalties in this matter.

10             There is also a Special Assessment of $100.

11             The defendant makes this payment without any

12   admission of any liability to the Senate of Pennsylvania, but

13   makes this payment to settle and compromise any claim which

14   may be served against him by any claim for such restitution.

15             The defendant agrees that this payment shall be made

16   prior to the date of sentence.  His payment's been made?

17             MR. GROSS:  Yes, we received the $150,000.  Yes.

18             THE COURT:  You probably said that, but I missed it.

19             MR. GROSS:  Yes, it's been made and we, of course,

20   are going to go the Clerk's Office to make the $100 payment

21   after this.

22             THE COURT:  Okay.  And $100 Special Assessment will

23   be paid in accordance with the law here.

24             No period of supervised release is imposed.

25             Now, you waived any appeal rights you have from this

1    sentence, Mr. Rubin; is that correct, counsel?

2              MR. GROSS:  Yes, your Honor.

3              THE DEFENDANT:  Yes, your Honor.

4              THE COURT:  Do you understand that it's in

5    accordance with the plea agreement?

6              THE DEFENDANT:  Yes, your Honor.

7              THE COURT:  Anything else we have at sentence that I

8    may have overlooked?

9              MR. GROSS:  I don't believe so, your Honor.

10             THE COURT:  Counsel for the Government, anything

11   else I forgot to --

12             MR. PEASE:  No, your Honor.

13             THE COURT:  Okay.  Very well.  This hearing is

14   adjourned.  Thank you.

15             MR. PEASE:  Thank you, your Honor.

16             MR. GROSS:  Thank you, your Honor.

17             (Court adjourned at 11:22 o'clock p.m.)

18                              *  *  *

CERTIFICATION


I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


S:/Geraldine C. Laws, CET          Date 8/22/19
Laws Transcription Service